OSCN Found Document:HAYES v. PENKOSKI

 

 
 

 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only

 
 
 

 
 HAYES v. PENKOSKI
2024 OK 49
Case Number: 121158
Decided: 06/11/2024
THE SUPREME COURT OF THE STATE OF OKLAHOMA

Cite as: 2024 OK 49, __ P.3d __

 
NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

 

 

Sheena Hayes and Morgan Lawrence-Hayes, Petitioners/Appellees,
v.
Richard Penkoski, Defendant/Appellant.

ON APPEAL FROM THE DISTRICT COURT OF WASHINGTON COUNTY

HONORABLE LINDA THOMAS, DISTRICT JUDGE

¶0 This appeal originates from a protective order obtained by Petitioners, Sheena Hayes and Morgan Lawrence-Hayes, against Defendant, Richard Penkoski, based primarily on his posts on social media. Defendant appealed and we sua sponte retained the appeal.

REVERSED.

Joe M. Fears and Richard D. White, Barber & Bartz, Tulsa, Oklahoma, for Appellant, Richard Penkoski.

Joshua L. Payton and Malaney L. Sanders, Law Office of Joshua L. Payton, PLLC, Tulsa, Oklahoma, for Appellees, Sheena Hayes and Morgan Lawrence-Hayes.

OPINION

DARBY, J., 

¶1 The question before this Court is whether Defendant, Richard Penkoski, harassed or stalked Petitioners, Sheena Hayes and Morgan Lawrence-Hayes, as required for issuance of a protective order. Because Penkoski did not direct his actions toward any individual person, which the statute requires before the district court may enter an order of protection, we answer in the negative.

I. STANDARD OF REVIEW

¶2 Statutory interpretation presents a question of law which we review de novo. Thurston v. State Farm Mut. Auto. Ins. Co., 2020 OK 105, ¶ 2, 478 P.3d 415, 417. A protection order under the Protection from Domestic Abuse Act, 22 O.S.2022, §§ 60--60.18, is reviewed for an abuse of discretion. Curry v. Streater, 2009 OK 5, ¶ 8, 213 P.3d 550, 554. "Under an abuse of discretion standard, the appellate court examines the evidence in the record and reverses only if the trial court's decision is clearly against the evidence or is contrary to a governing principle of law." Ibid. "To reverse under an abuse of discretion standard, an appellate court must find the trial court's conclusions and judgment were clearly erroneous, against reason and evidence." Ibid.

II. BACKGROUND & PROCEDURAL HISTORY

¶3 Penkoski is a public figure who holds himself out as a pastor, activist, and street preacher. Petitioners are also public figures; Morgan Lawrence-Hayes is President of Oklahomans for Equality and Sheena Hayes is Vice President of Oklahomans for Equality. Hayes is also the outreach committee chair for Petitioners' church, Disciples Christian.

¶4 On September 9, 2022, Penkoski created a post on Facebook. See Pet'rs' Ex. 2. The post said: "This is NOT a church!! This is a satanic recruitment center to groom and indoctrinate children while they pervert the Word of God[.]" Id. The post also contained two photographs, the first was a collaboration of photos of individuals with the overlying text "DISCIPLES CHRISTIAN CHURCH" in bold and below that in italics the text "Happy Pride Month[.]" Id. The photograph cuts off halfway through the second line of text. The second photograph depicts a group of adults and children holding what appears to be photos or pieces of art. No text indicated the identity of the individuals in either photo. Petitioners testified that they and their minor child were pictured in both of the photos. Tr. of Procs. 35:6--22, Feb. 15, 2023. The photographs were available on the church's public page. Tr. of Procs. 57:14--16, 72:25--73:3.

¶5 The next day, on September 10, 2022, Penkoski attended the Bartlesville Pride Event in Bartlesville, Oklahoma. Penkoski allegedly stood on the street corner and yelled into a bullhorn for several hours, shouting slurs across the street toward the children's bouncy house. Penkoski testified that he stayed where the police asked the protesters to assemble during the Pride Event. Penkoski had no direct interaction with Petitioners and Penkoski did not mention Petitioners' names or Petitioners' church by name.

¶6 On November 7, 2022,[1] both Petitioners and Penkoski chose to attend and speak at the Bartlesville City Council meeting. At the meeting, Penkoski did not speak directly to the Petitioners, mention them by name, or have any direct interaction with them. No videos or photos of the city council meeting were submitted into evidence.

¶7 On November 11, 2022, Penkoski again posted on Facebook. See Pet'rs' Ex. 4. This post consisted of the text "Liar, liar, pants on fire!!" and a video. Id. The thumbnail of the video in the post showed a woman standing at a lectern with a microphone. The woman had dark colored, long hair which covered most of her face making her virtually unrecognizable in the photo. No text in the post identified the woman in the video. Petitioners testified that the video showed Lawrence-Hayes speaking at the City Council meeting but did not submit a copy of the posted video into evidence. See Tr. of Procs. 16:14--16.

¶8 On November 12, 2022, Penkoski again posted on Facebook. See Pet'rs' Ex. 5. This post had the text "Oklahomans for Eqaulity [sic] in Bartlesville OK caught lying about sexualizing children... See more" and a video. Id. The thumbnail of the video in the post was almost identical to the previous one, showing a woman standing at a lectern with a microphone, with her long, dark hair covering most of her face making her virtually unrecognizable from the photo. No text in the post identified the woman in the video other than that they were associated with Oklahomans for Equality. Petitioners testified that it was also an image of Lawrence-Hayes. Tr. of Procs. 18:7--9. Petitioners did not submit a copy of any video for admission into evidence.

¶9 On November 14, 2022,[2] Penkoski again posted on Facebook. See Pet'rs' Ex. 3. This post stated:

I now pronounce you an abomination!!

God is not in this, matter of fact God hates the perversion of marriage. God created married [sic] for 1 man and 1 woman ONLY!!

This synagogue for satan operates in Bartlesville OK.

You should see what they think is approbation [sic] for children.

Matthew 18:6, "but whoever causes one of these little ones who believe in Me to stumble, it would be better for him to have a heavy millstone hung around his neck, and to be drowned in the depth of the sea."

Since there [sic] triggered over that verse, I wonder how they feel about Romans 1:32, "and although they know the ordinance of God, that those who practice such things are worthy of death, they not only do the same, but also give hearty approval to those who practice them.

Id. Below the text, Petitioners' exhibit of the Facebook post shows one black and white photograph which shows two people from the back. One is wearing a dark suit, and the other is wearing a white dress and veil. Also visible in the photo are flowers and lit candles. There are no other adults or children shown. No text in the post identified the two individuals in the photo, or the name of the referenced entity in the post. Petitioners testified that this Facebook post contained two photographs obtained from their private Facebook page and included Petitioners and their minor child in both photos, but no child was visible in the one photo in the submitted exhibit. See Tr. of Procs. 15:8--9. Furthermore, Penkoski and Lawrence-Hayes both testified that all of the photographs Penkoski posted were available on the church's public Facebook page. Tr. of Procs. 57:14--16, 72:25--73:3.

¶10 On November 15, 2022, Petitioners contacted Bartlesville police. On November 22, 2022, Petitioners filed their Petition for Protective Order. Petition, PO-2022-284 (Washington Cty. Nov. 22, 2022); ROA 1. The petition described the time line of incidents as occurring between September through November 2022:

The defendant first began his harassing behavior in the week prior to Bartlesville Pride. Before the event he shared pictures of parents & children of Disciples Christian Church & called us (the photo included our family) groomers & pedophiles. He then came to Bartlesville Pride as a protestor & stood next to the children's area shouting vulgar & obscene things. In November, he took a photo from my personal facebook & shared it to his page stating bible verses that imply I should be killed for being gay. He showed up at the November City Council meeting speaking out with more bible verses used to justify harming or killing the LGBT community. Following the meeting, he again shared a video of my statements calling me a liar. We have never been in contact with Mr. Penkoski, but he has repeatedly targeted our family with violent threats via social media, and he is now coming to city meetings in a town he does not live in.

Id., at 3--4. Attached to the petition was a police report which stated Penkoski's offense was committing an obscene/threatening/harassing phone call (intimidation) pursuant to title 21, section 1172.[3] Id., at 9. The police narrative stated:

On 11/15/22, I was contacted by the President of Oklahomans for Equality, Morgan Lawrence, in regard to harassment. Mrs. Lawrence is married to the Vice President, Sheena Hayes. Mrs. Lawrence also has a son [omitted].

On 09/10/22, Bartlesville held an outdoor pride event at Unity Square (300 SE Adams). Due to overwhelming protests and threats, Bartlesville Police Department had to take extra security measures at this event. During the protest, Mr. Rich Penkoski is seen on multiple videos using a blowhorn and saying vulgar statements and obscenities. He is also seen holding a sign that says G-Got A-Aids Y-Yet. Mr. Penkoski would say "homosexuals rape dogs",[sic] "raping anus" and they are all "pedophiles." These sayings were confirmed by Officer Lemmons who was working the event as extra security. Mr. Penkoski can be identified as the one making these comments with the blowhorn near the children's play area of the Pride Event.

Mrs. Lawrence informed me, that a Facebook post was made after the pride event. The post was removed by Facebook, but she was able to provide me with screenshots. Those have been uploaded to this case.

The post was made by Mr. Penkoski and stated the following: [quotes Facebook post laid out in paragraph 9 supra]. Mr. Penkoski then attached two photos of Mrs. Lawrence, Mrs. Hayes, and [minor child] at their wedding day ceremony. Mr. Penkoski is believed to be saying a millstone should be hung around "their" neck and to be drowned in the depth of the sea.

Five days ago, on 11/11/22, Mr. Penkoski made another post in regard to Mrs. Lawrence. The post stated "Liar, liar, pants on fire!!" Mr. Penkoski then attaches a video from the city council meeting in which Mrs. Lawrence is speaking in regard to the Pride Event and a petition involving the banning of adult entertainment in public spaces. Mr. Penkoski shows 38 seconds of Mrs. Lawrence speaking at the city council meeting and then edits the video to show portions of the drag queen performance on 9/10/22 at the Pride event. At the 1:12 mark, Mr. Penkoski cuts back to Mrs. Lawrence giving her speech. He allows this to play for about 18 seconds before again editing the video back to portions of the drag queen performance. While these edits are going on, Mr. Penkoski uses Mrs. Lawrence's words and altered voice over the playing of the performances. The total length of the video is 2:06.

. . . .

Petition, at 10--11. The district court issued an emergency protective order the same day. Emer. Order of Prot., Nov. 22, 2022; ROA 13--16.

¶11 On December 15, 2022, Petitioners had Penkoski served with the emergency protective order while Penkoski was live-streaming at a protest in Tulsa, Oklahoma. Allegedly, the police officer stated both of Petitioners' names on the live-stream while serving Penkoski. Afterward, Penkoski posted the live-stream on social media for at least five days. Petitioners, however, did not provide a copy of the live-stream video to the court or offer the video into evidence.[4]

 

¶12 On February 15, 2023, the Washington County District Court held the protective order hearing and issued a permanent order of protection for five years. Order of Prot., Feb. 15, 2023; Tr. of Procs. 84:11--13. The order prohibited Penkoski from posting any pictures, images, videos, or any likenesses of any kind of the Petitioners or their minor child on any social media; making reference to, mentioning, printing, or otherwise publishing their names on social media; and required that Penkoski must stay 500 feet away from Petitioners and minor child, in addition to standard protective order restrictions. Tr. of Procs. 84--88.

 

¶13 Penkoski timely appealed from the order and this Court sua sponte retained the appeal.

III. ANALYSIS

¶14 The Protection from Domestic Abuse Act, 22 O.S. §§ 60--60.18, affords relief to victims of domestic abuse, stalking, harassment, rape, or crime. 22 O.S.2022, § 60.2(A). The Petitioners alleged that Penkoski stalked and harassed them, and the district court agreed when issuing its protective order. Both harassment and stalking are defined in the Act.

¶15 Pursuant to title 22, section 60.1(5),

"Harassment" means a knowing and willful course or pattern of conduct by a family or household member or an individual who is or has been involved in a dating relationship with the person, directed at a specific person which seriously alarms or annoys the person, and which serves no legitimate purpose. The course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress and must actually cause substantial distress to the person. "Harassment" shall include, but not be limited to, harassing or obscene telephone calls in violation of Section 1172 of Title 21 of the Oklahoma Statutes and fear of death or bodily injury; . . . .

22 O.S.2022, § 60.1(5).[5] This definition clearly requires the "harassing" behavior to take place between family or household members, or individuals who are or have been involved in a dating relationship. Petitioners and Penkoski in this case have no personal relationship. Penkoski thus has not committed harassment under this statutory definition. We need not look at the rest of the definition once one mandatory element has failed. The district court's ruling that Penkoski harassed the Petitioners was contrary to law. The district court abused its discretion when it found that Penkoski harassed the Petitioners.

¶16 Stalking under the act is defined as:

the willful, malicious, and repeated following or harassment of a person by an adult, emancipated minor, or minor thirteen (13) years of age or older, in a manner that would cause a reasonable person to feel frightened, intimidated, threatened, harassed, or molested and actually causes the person being followed or harassed to feel terrorized, frightened, intimidated, threatened, harassed or molested. Stalking also means a course of conduct composed of a series of two or more separate acts over a period of time, however short, evidencing a continuity of purpose or unconsented contact with a person that is initiated or continued without the consent of the individual or in disregard of the expressed desire of the individual that the contact be avoided or discontinued. Unconsented contact or course of conduct includes, but is not limited to: . . . .

22 O.S.2022, § 60.1(10).[6] This is followed by a list of applicable actions within the statute.[7]

¶17 Penkoski first argues that his actions did not meet the requirements of stalking because the Act applies to protect individuals, not organizations, noting that the statute addresses "following or harassment of a person." See id. (emphasis added). Penkoski asserts that he has never contacted Petitioners, or their family, household members, employers, coworkers, or friends. Penkoski notes that his Facebook posts were only directed towards Oklahomans for Equality and Disciples Christian Church, not Petitioners as individuals. Penkoski also argues that he took no repeated action or course of conduct toward Petitioners, because he never named either of Petitioners in any of his posts. Penkoski notes that the police officer did state Petitioners' names during Penkoski's live stream. But Penkoski noted that the Petitioners' names in this action were already a matter of public record.

¶18 Penkoski also asserts that he made no actual threats of, or calls for, violence against anybody and noted that Petitioners admitted that Penkoksi's posts did not make actual threats or calls for violence. Penkoski argues that his words were not "malicious." Penkoski notes that the Act does not contain a definition of malicious, so he looked to the ordinary meaning provided in Black's Law Dictionary, which requires the intentional doing of a wrongful act without just cause or excuse. Penkoski notes that his posts were made under the constitutionally-protected legitimate purpose of influencing public opinion on a prominent issue and were thus not malicious. Finally, Penkoski argues that the district court's application of the Act to his conduct impermissibly infringes on his constitutional right to speak freely and publicly on a matter of public interest.

¶19 On appeal, Petitioners argue that Penkoski "admitted he used social media posts as his only method of contacting and communicating with the Petitioners." Ans. Br., at 22. But Penkoski's actual testimony was:

They alleged harassment and stalking, But by those two definitions, harassment requires some kind of communication to them, and they've testified I have never communicated with them or to them, ever. I have never sent them a message. I have never called them. I have never communicated with them in any way, shape, or form other than to make my posts on my public platforms. Again, I have never even been in the same room with them with the exception of the city council meeting where I spoke, didn't address them.

Tr. of Procs. 75:21--76:5 (emphasis added). This testimony is not an admission that Penkoski used social media to contact and communicate with Petitioners.

¶20 Petitioners also argue that Penkoski's conduct was a true threat, excluded from any first amendment protection and Penkoski's conduct meets the elements of stalking. Petitioners note that the definition of stalking requires "willful, malicious, and repeated following or harassment of a person by an adult . . . in a manner that would cause a reasonable person to feel frightened, intimidated, threatened, harassed, or molested and actually causes the person being followed or harassed to feel terrorized, frightened, intimidated, threatened, harassed, or molested." Petitioners call the Court's attention to the district court's finding that Penkoski's conduct was willful and malicious and that he repeated his behavior over and over until it became harassing.

¶21 At the end of the hearing, the district court said:

Okay. At this time, I have a few comments that I want to make and then I will give my ruling.

Mr. Penkoski, you are correct, we all have a constitutional right to free speech; however, we do not have a constitutional right to step over certain and specific boundaries in using that speech to target certain and specific individuals.

You also said that you believe that this protective order was used to limit your ability to preach the Bible. And, again, you have that constitutional right to preach the Bible and use any speech that you so want to use as long as it doesn't target individual people.

You also said that you've never met and the testimony was from both the defendants as well -- excuse me -- plaintiffs as well, that you've never met or been in the same room other than the city council conference room. You've never met them. You've never interacted with them personally; however, stalking and harassment is not limited to just personal contact.

With respect to your comments regarding utilizing their public pictures, nothing prevents you from using pictures that are public so long as you don't use them in a manner that is considered to be harassing or stalking.

At this time, I will find that you, Mr. Penkoski, have, in a knowing and willful manner, conducted a pattern of conduct which a reasonable person would believe to be harassment and would therefore suffer substantial emotional distress. And it has actually caused substantial emotional distress to the plaintiffs in this case.

While you may not have had personal contact with them, you have used social media, which is arguably even more egregious because it certainly goes out to -- can go out to hundreds of thousands of people in an instant. And our behaviors of targeting them, not what you've said with respect to your belief in reference to the Bible, but when you target those to specific people and you call them out by name, that changes the whole picture.

Also, with respect to stalking, your behavior is willful, it's malicious, and it's repeated over and over and over to the extent that it does become harassing. And you've done that in a manner that would cause any reasonable person to feel frightened, intimidated, threatened, harassed, as they testified to, just scared for their own safety and the safety of their child. You have conducted yourself in a manner that, over a period of time, it's not just one thing, it's not just that you posted it one time or that you made specific references to them personally and their family personally. You did it over a period of time without their consent, obviously, and in a manner that just completely disregards their rights to feel safe in the community.

So, at this time, I am going to grant the permanent protective order.

Tr. of Procs. 82:7--84:12 (emphasis added).

IV. CONCLUSION

¶22 The definition of stalking requires "willful, malicious, and repeated following or harassment of a person." Section 60.1(10), both prior to November 1, 2022, and as amended effective November 1, 2022, gives a list of examples of uninvited contact or course of conduct which would be considered stalking. Every example concerns contact or conduct toward an "individual." Penkoski's actions were not directed toward an individual person, but rather were public Facebook posts that named two organizations, not individuals. Penkoski spoke neither of Petitioners' names at the parade or the city council meeting. Penkoski did not send electronic communications to Petitioners, or contact them directly by any means, including directing a message, comment, or other content toward them. Penkoski did not photograph, videotape, or otherwise record Petitioners' activities. Penkoski created Facebook posts that included photos or videos he obtained from other sources which, while they depicted one or both of Petitioners, did not name either Petitioner or direct his message toward either Petitioner. The district court's decision was clearly against the evidence, and based on the court's mistaken finding that Penkoski "made specific references to [Petitioners] personally and their family personally" and that he targeted his posts to specific people and "called them out by name." The district court abused its discretion when it found that Penkoski directed his posts or comments toward the Petitioners.

¶23 We need not address all of Penkoski's or Petitioners' arguments, including Penkoski's First Amendment arguments, because regardless of protected speech status, the district court abused its discretion in issuing the order of protection.

¶24 We find that the district court abused its discretion when it issued an Order of Protection against Penkoski for his actions in this case. The district court's order of protection is reversed and the order of protection is vacated.

REVERSED.

Kane, C.J., Rowe, V.C.J., Winchester, Darby, and Kuehn, JJ., concurring;

Kauger, Edmondson, Combs, and Gurich (by separate writing), JJ., concurring in part, dissenting in part.

FOOTNOTES

[1] The date of this meeting is not in the record nor did any party testify to it. In their Petition for the Protective Order, Petitioners alleged the meeting in question was the November City Council meeting. Petition, PO-2022-284 (Washington Cty. Nov. 22, 2022); ROA Instrument 1, 3. We may take judicial notice of certain facts. See 12 O.S.2011, §§ 2202, 2203(C). We take note of public records that the November 2022 Bartlesville City Council meeting occurred on November 7, 2022. See City of Bartlesville, Meeting Agendas, Packets and Minutes, (Apr. 4, 2024, 1:11pm), https://www.cityofbartlesville.org/city-government/city-council/meeting-agendas/.

[2] The screenshot of this Facebook post does not include a date. Counsel stated he believed it was from September. Tr. of Procs. 15:15. The police report seems to indicate the post occurred prior to the city council meeting. But Lawrence-Hayes testified that the Facebook post with the photo of the church members and the picture of the wedding were both posted on November 14, 2022. Tr. of Procs. 56:1--14. We are not ruling on the date of the Facebook post, but rather simply using the most specific alleged date for purposes of analysis in the opinion.

[3] Title 21, section 1172 states:

A. It shall be unlawful for a person who, by means of a telecommunication or other electronic communication device, willfully either:

1. Makes any comment, request, suggestion, or proposal which is obscene, lewd, lascivious, filthy, or indecent;

2. Makes a telecommunication or other electronic communication including text, sound or images with intent to terrify, intimidate or harass, or threaten to inflict injury or physical harm to any person or property of that person;

3. Makes a telecommunication or other electronic communication, whether or not conversation ensues, with intent to put the party called in fear of physical harm or death;

4. Makes a telecommunication or other electronic communication, including text, sound or images whether or not conversation ensues, without disclosing the identity of the person making the call or communication and with intent to annoy, abuse, threaten, or harass any person at the called number;

5. Knowingly permits any telecommunication or other electronic communication under the control of the person to be used for any purpose prohibited by this section; and

6. In conspiracy or concerted action with other persons, makes repeated calls or electronic communications or simultaneous calls or electronic communications solely to harass any person at the called number(s).

B. As used in this section, "telecommunication" and "electronic communication" mean any type of telephonic, electronic or radio communications, or transmission of signs, signals, data, writings, images and sounds or intelligence of any nature by telephone, including cellular telephones, wire, cable, radio, electromagnetic, photoelectronic or photo-optical system or the creation, display, management, storage, processing, transmission or distribution of images, text, voice, video or data by wire, cable or wireless means, including the Internet. The term includes:

1. A communication initiated by electronic mail, instant message, network call, or facsimile machine including text, sound or images;

2. A communication made to a pager; or

3. A communication including text, sound or images posted to a social media or other public media source.

C. Use of a telephone or other electronic communications facility under this section shall include all use made of such a facility between the points of origin and reception. Any offense under this section is a continuing offense and shall be deemed to have been committed at either the place of origin or the place of reception.

D. Except as provided in subsection E of this section, any person who is convicted of the provisions of subsection A of this section, shall be guilty of a misdemeanor.

E. Any person who is convicted of a second offense under this section shall be guilty of a felony.

21 O.S. Supp. 2019, § 1172.

[4] On appeal, Petitioners have alleged that Penkoski made an active choice to publish the live-stream after its completion in order to publish Petitioner's names. This argument was not raised at the district court and this Court cannot take judicial notice regarding methods and requirements of posting Facebook live videos.

[5] This definition is unchanged from the May 11, 2022 version of the statute to the November 1, 2022 version.

[6] This part of the stalking definition is unchanged from the May 11, 2022 version of the statute to the November 1, 2022 version.

[7] The list of applicable actions within the stalking definition prior to November 1, 2022, states:

Unconsented contact or course of conduct includes, but is not limited to:

a. following or appearing within the sight of that individual,

b. approaching or confronting that individual in a public place or on private property,

c. appearing at the workplace or residence of that individual,

d. entering onto or remaining on property owned, leased or occupied by that individual,

e. contacting that individual by telephone,

f. sending mail or electronic communications to that individual, or

g. placing an object on, or delivering an object to, property owned, leased or occupied by that individual; . . . .

22 O.S.2022, § 60.1(10) (as amended by 2022 Okla. Sess. Laws, ch. 246, § 2 (effective May 11, 2022)). Section 60.1(10), effective November 1, 2022, states:

Unconsented contact or course of conduct includes, but is not limited to:

a. maintaining a visual or physical proximity to the individual,

b. approaching or confronting that individual in a public place or on private property,

c. appearing at the workplace of the individual or contacting the employer or coworkers of the individual,

d. appearing at the residence of the individual or contacting the neighbors of the individual,

e. entering onto or remaining on property owned, leased or occupied by the individual,

f. contacting the individual by telephone, text message, electronic message, electronic mail, or other means of electronic communication or causing the telephone or electronic device of the individual or the telephone or electronic device of any other person to ring or generate notifications repeatedly or continuously, regardless of whether a conversation ensues,

g. photographing, videotaping, audiotaping, or, through any other electronic means, monitoring or recording the activities of the individual. This subparagraph applies regardless of where the act occurs,

h. sending any physical or electronic material or contacting the individual by any means, including any message, comment, or other content posted on any Internet site or web application,

i. sending to a family member or member of the household of the individual, or any current or former employer of the individual, or any current or former coworker of the individual, or any friend of the individual, any physical or electronic material or contacting such person by any means, including any message, comment, or other content posted on any Internet site or web application, for the purpose of obtaining information about, disseminating information about, or communicating with the individual,

j. placing an object on, or delivering an object to, property owned, leased or occupied by the individual,

k. delivering an object to a family member or member of the household of the individual, or an employer, coworker, or friend of the individual, or placing an object on, or delivering an object to, property owned, leased, or occupied by such a person with the intent that the object be delivered to the individual, or

l. causing a person to engage in any of the acts described in subparagraphs a through k of this paragraph; . . . .

22 O.S.2022, § 60.1(9) (as amended by 2022 Okla. Sess. Laws, ch. 318, § 5 (effective Nov. 1, 2022)).

 

 

Gurich, J., concurring in part and dissenting in part:

¶1 The majority correctly points out that Penkoski's conduct, as a matter of law, did not constitute harassment. However, the record in this case contained sufficient evidence to support the decision of the trial court finding Richard Penkoski engaged in behavior which met the statutory definition of "stalking," as codified in the Protection from Domestic Abuse Act, 22 O.S. 2022, § 60.1(9).[1]

¶2 Although some of Penkoski's commentary appeared to be directed toward Oklahomans for Equality, in truth, his oppressive and intimidating conduct was directed toward Morgan Lawrence-Hayes and Sheena Hayes (Appellees) as individuals. It is important to note that the trial court only considered issuing a protective order to the Appellees as individuals; the judge did not consider an order on behalf of the organization or community at-large. Judge Thomas specifically explained, "I only have the jurisdiction at this point to deal with whatever individual harm you might be referring to." As such, I respectfully dissent from that portion of the majority opinion which concludes the evidence did not establish stalking of the Appellees in their individual capacities.

¶3 Title 22 O.S. Supp. 2023, § 60.2(A) provides that a "victim of domestic abuse, a victim of stalking, a victim of harassment...or any adult victim of a crime may seek relief under the provisions of the Protection from Domestic Abuse Act." Penkoski's conduct, as a matter of law, does not meet the statutory definition of harassment.[2] However, the evidence supports a finding that he engaged in stalking of Appellees. First, the definition of stalking reads as follows:

9. "Stalking" means the willful, malicious, and repeated following or harassment[3] of a person by an adult, emancipated minor, or minor thirteen (13) years of age or older, in a manner that would cause a reasonable person to feel frightened, intimidated, threatened, harassed, or molested and actually causes the person being followed or harassed to feel terrorized, frightened, intimidated, threatened, harassed or molested. Stalking also means a course of conduct composed of a series of two or more separate acts over a period of time, however short, evidencing a continuity of purpose or unconsented contact with a person that is initiated or continued without the consent of the individual or in disregard of the expressed desire of the individual that the contact be avoided or discontinued. Unconsented contact or course of conduct includes, but is not limited to:

a. maintaining a visual or physical proximity to the individual,

b. approaching or confronting that individual in a public place or on private property,

c. appearing at the workplace of the individual or contacting the employer or coworkers of the individual,

d. appearing at the residence of the individual or contacting the neighbors of the individual,

e. entering onto or remaining on property owned, leased or occupied by the individual,

f. contacting the individual by telephone, text message, electronic message, electronic mail, or other means of electronic communication or causing the telephone or electronic device of the individual or the telephone or electronic device of any other person to ring or generate notifications repeatedly or continuously, regardless of whether a conversation ensues,

g. photographing, videotaping, audiotaping, or, through any other electronic means, monitoring or recording the activities of the individual. This subparagraph applies regardless of where the act occurs,

h. sending any physical or electronic material or contacting the individual by any means, including any message, comment, or other content posted on any Internet site or web application,

i. sending to a family member or member of the household of the individual, or any current or former employer of the individual, or any current or former coworker of the individual, or any friend of the individual, any physical or electronic material or contacting such person by any means, including any message, comment, or other content posted on any Internet site or web application, for the purpose of obtaining information about, disseminating information about, or communicating with the individual,

j. placing an object on, or delivering an object to, property owned, leased or occupied by the individual,

k. delivering an object to a family member or member of the household of the individual, or an employer, coworker, or friend of the individual, or placing an object on, or delivering an object to, property owned, leased, or occupied by such a person with the intent that the object be delivered to the individual, or

l. causing a person to engage in any of the acts described in subparagraphs a through k of this paragraph; and

22 O.S. Supp. 2022, § 60.1(9) (emphasis added).[4] Reading the plain text of this section, it is clear Penkoski's conduct satisfied the statutory definition of stalking.

¶4 First, his September 9, 2022, post clearly displayed an image which included both Appellees and their child. Significantly, the post contained a caption which effectively accused those people in the Disciples Christian Church group photo (which included Appellees), of creating a "satanic recruitment center to groom and indoctrinate children. . ." Use of this photograph, along with the accompanying hate speech, directly affected the Appellees. Although Appellees were not named, the post's impact was not limited to the church or any other organization. On November 11 and 12, 2022, Penkoski made two publications which included an image of Lawrence-Hayes, taken from the Bartlesville city council meeting. Therein, Penkoski accused Lawrence-Hayes of lying about "sexualizing children."[5] A Facebook publication made by Penkoski on November 14, 2022, showed both Appellees exchanging vows during their wedding ceremony. It also contained two bible verses which referenced death to individuals acting contrary to certain biblical teachings.[6] The photograph was taken from Lawrence's personal Facebook page and was utilized by Penkoski without permission. Both Appellees testified they considered the post to be threatening and that they perceived the biblical verses as a call for their murder. In addition, Penkoski posted videos of Lawrence-Hayes speaking at the Bartlesville City Council meeting to a social media platform.

¶5 Further, Penkoski made physical appearances in locations he knew the Appellees would be present. He attended an LBGTQ-plus event in Bartlesville and positioned himself (with a group of other men) directly across from Appellees. During this episode, Penkoski used a bullhorn and yelled obscenities toward Appellees.[7] Subsequently, Penkoski appeared at a Bartlesville City Council meeting to confront the Appellees about his hostile conduct at the Bartlesville Pride festival.

¶6 Penkoski was served with the emergency protective order on December 15, 2022. At the time, he was livestreaming a video to social media. When the paperwork was handed to Penkoski, the Tulsa Police Officer identified the Appellees as the petitioners. Penkoski subsequently disseminated the video with Appellees' names via his social media account(s), purposefully making Appellees' names available to his followers. This disclosure was intentionally done to harass, intimidate and torment the Appellees even more. The video post compounded Appellees' fears and brought about a flood of abhorrent messages from Penkoski's social media followers.

¶7 Penkoski's social media posts and intimidation tactics were not isolated incidents; rather they were an ongoing "course of conduct" designed to intimidate/harass Appellees and potentially incite violence toward the couple. He even testified that the Appellees, as parties to a same-sex relationship, were "worthy of death," according to his interpretation of the Bible. Considering the testimony and exhibits, it is clear Penkoski's actions were directed toward Appellees as individuals. In addition, the record supports the trial court's legal determination that Penkoski's repeated bullying (both in person and via social media) and incendiary rhetoric toward Appellees satisfied the definition of stalking. Because the trial judge did not abuse her discretion, I would affirm the finding that Penkoski engaged in stalking of Appellees.[8]

 

FOOTNOTES

 

[1] 22 O.S. § 60.1 was amended twice in 2022. In the first amendment, the definition of stalking is found in paragraph 10, effective May 11, 2022. The second amendment, effective November 1, 2022, renumbered the stalking definition to paragraph 9 and expanded the definition.

[2] 22 O.S.2022, § 60.1(5) provides in relevant part: "'Harassment' means a knowing and willful course or pattern of conduct by a family or household member or an individual who is or has been involved in a dating relationship with the person, directed at a specific person which seriously alarms or annoys the person, and which serves no legitimate purpose."

[3] Harassment is defined as "[w]ords, conduct, or action (usu. repeated or persistent) that, being directed at a specific person, annoys, alarms, or causes substantial emotional distress to that person and serves no legitimate purpose; purposeful vexation." Harassment, Black's Law Dictionary (11th ed. 2019). Although the legislature defined harassment in section 60.1(5), it seems paradoxical to include that definition within the definition of stalking; to do so would effectively render this portion of the stalking definition redundant and superfluous.

[4] As noted in the majority opinion, section 60.1 was amended during the 2022 Oklahoma Legislative Session and became effective on November 1, 2022. Additional examples were provided in the amended version of the statute; however, they are no less applicable as the previous iteration of section 60.1 specifically noted that the illustrations offered were not exhaustive.

[5] Penkoski's posts included photos of the women and referenced "Oklahomans for Eqaulity [sic]." Petitioner's Exs. 4 & 5. Both Appellees were active leaders in Oklahomans for Equality - Bartlesville, which is a local organization promoting rights for the LBGTQ-plus community. Lawrence-Hayes served as the president of the organization, and Hayes was the vice-president. In addition, Hayes acted as the outreach chairperson for Disciples Christian Church, which is a Bartlesville congregation promoting equality and diversity. As members of the LBGTQ-plus community, and because of their leadership status with the aforementioned entities, Appellees became the direct targets of Penkoski's persecution and terrorizing conduct.

[6] Penkoski referred to Matthew 18:6, which he quoted as, "if anyone causes one of these little ones who believe in me to stumble, it would be better for him to have a heavy millstone hung around his neck, and to be drowned in the depth of the sea." He also referred to Romans 1:32, which he recited as follows, "and although they know the ordinance of God, that those who practice such things are worthy of death, they not only do the same, but also give hearty approval to those who practice them." Petitioner's Ex. 3.

[7] Testimony of Sheena Hayes, Tr., 30, Feb. 15, 2023.

[8] By affirming the trial court's finding of stalking, the Court would be required to engage in an analysis of the issues on appeal relating to the First Amendment. The majority opinion has avoided these difficult questions by holding Penkoski's actions and hate-filled speech were directed toward organizations and not individuals; and therefore, were not subject to the Oklahoma Domestic Protection Act.

 

 

 

 

 

 

 

 

 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Supreme Court Cases

 
Cite
Name
Level

 
2009 OK 5, 213 P.3d 550, 
CURRY v. STREATER
Discussed

 
2020 OK 105, 478 P.3d 415, 
THURSTON v. STATE FARM MUTUAL AUTOMOBILE INSUR. CO.
Discussed

Title 12. Civil Procedure

 
Cite
Name
Level

 
12 O.S. 2202, 
Judicial Notice of Adjudicative Facts
Cited

Title 21. Crimes and Punishments

 
Cite
Name
Level

 
21 O.S. 1172, 
Obscenity, Threats, or Harassment by Telephone or Other Electronic Communication - Penalty
Cited

Title 22. Criminal Procedure

 
Cite
Name
Level

 
22 O.S. 60, 
Short Title
Discussed

 
22 O.S. 60.1, 
Definitions
Discussed at Length

 
22 O.S. 60.2, 
Protective Order - Petition - Form - Filing Fee - Preparation - Protection of Animal
Discussed

 
 

 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA